**COZEN O'CONNOR**
BY:   THOMAS McKAY, III, ESQUIRE
      MARK H. GALLANT, ESQUIRE, *PRO HAC VICE*
      KIMBERLY BANE HYNES, ESQUIRE
457 Haddonfield Road, Suite 300
P.O. Box 5459
Cherry Hill, New Jersey 08002-2220
(856) 910-5000
ATTORNEYS FOR COOPER UNIVERSITY HOSPITAL

RECEIVED
CLERK U.S. DISTRICT CLERK

2008 JUL 28 P 3: 48

U.S. DISTRICT COURT

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | | |
|---|---|---|
| COOPER UNIVERSITY HOSPITAL, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. |
| MICHAEL O. LEAVITT, Secretary,<br>Department of Health and Human Services, | : | |
| Defendant. | : | |

---

## COMPLAINT

Plaintiff, Cooper University Hospital ("Cooper"), by and through its undersigned attorneys, brings this action for judicial review of a final decision of Defendant Michael O. Leavitt, in his official capacity as Secretary of the United States Department of Health and Human Services (the "Secretary"), and avers as follows:

## Introduction

1.      Cooper is a not-for-profit academic medical center located in Camden, New Jersey that participates in the Medicare and Medicaid programs.

2.      Cooper brings this action pursuant to Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*. (the "Medicare Statute'"), and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551 *et seq*.

3.      The Medicare Statute directs the Secretary to make supplemental Medicare payments, called disproportionate share hospital ("DSH") payments, to hospitals that serve "a significantly disproportionate number of low-income patients." See 42 U.S.C. § 1395ww(d)(5)(F). These payments are in addition to the base inpatient "DRG" payments.

4.      The DSH payment is calculated, in part, based on the number of days a DSH hospital provides services to "low-income patients." Under the Medicare Statute, the term "low-income patients" includes all patients who are not entitled to Medicare but who were "eligible for medical assistance under a State Plan approved under Title XIX." 42 U.S.C. § 1395ww(d)(5)(F)(i)(II).

5.      When computing Cooper's fiscal year 2000 DSH payment, the Secretary, through his fiscal intermediary, excluded hospital days attributable to patients eligible for New Jersey's Charity Care Program ("NJCCP"), which is part of and funded under New Jersey's Medical Assistance State Plan approved under Title XIX.  Cooper timely appealed the Secretary's action to the Provider Reimbursement Review Board (the "Board").

6.      The Board reversed the Secretary's exclusion of NJCCP days from the calculation of the DSH payment based on the plain terms of the Medicare statute and on longstanding precedents.  However, the Secretary, through the Administrator of the Centers for Medicare and Medicaid Services ("CMS"), reversed the Board's decision.

2

7.     The Secretary's decision contravenes the plain and unambiguous wording of the DSH statute, is inconsistent with congressional intent, and is arbitrary, capricious and otherwise contrary to law.  Accordingly, Cooper seeks an Order reversing the Secretary's decision and directing the Secretary to recalculate Cooper's FY 2000 DSH payment to include patient days relating to patients eligible for NJCCP.

## Jurisdiction and Venue

8.     The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1331.

9.     This Court is authorized to issue declaratory and other appropriate relief against Defendant under 28 U.S.C. §§ 2201, 2202.

10.     Venue is appropriate in this judicial district under 42 U.S.C. § 1395oo(f)(1).

## Parties

11.     Plaintiff, Cooper University Hospital (Medicare Provider No. 31-0014), is a not-for-profit 561 bed academic medical center located at One Cooper Plaza, New Jersey 08103.

12.     Cooper participated in both the Medicare and Medicaid programs at all times relevant to this action.

13.     Cooper is located in Camden, New Jersey, one of the poorest communities in the nation.  As a result Cooper serves a very heavily concentrated population of indigent patients, including indigent patents whose care is funded under the NJCCP.

14.     Cooper has routinely qualified as a DSH hospital under Medicare and so qualified during Fiscal Year 2000.

15.     Approximately 36%-37% of Cooper's total census comprises Medicaid, indigent or NJCCP patients.

3

16.    New Jersey ranks hospitals based on the level of indigent care that they provide. Cooper is consistently ranked among the top ten hospitals in the state with respect to the level of NJCCP dollars that they receive.

17.    Defendant, Michael O. Leavitt is the Secretary of the United States of Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C., 20201 and, as such, is the official responsible for operations of the Medicare program.

### Factual Background

A.    General Background of the Medicare Program

18.    Congress enacted the Medicare program (Title XVIII of the Social Security Act) in 1965. As originally enacted, Medicare was a public health insurance program that furnished health benefits to participating individuals once they reached the age of 65. Over the years, it has expanded to provide health benefits to qualifying disabled persons and to individuals suffering from end-stage renal disease. 42 U.S.C. § 1395 *et seq.*

19.    Among the benefits covered by Medicare are hospital services. Reimbursement for hospital services is provided under Part A of the Medicare program.

20.    For cost reporting years beginning before October 1, 1983, the Medicare Program reimbursed hospital services on a "reasonable cost" basis. 42 U.S.C. §1395f(b).

21.    Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted a prospective payment system ("PPS") to reimburse most hospitals, like Cooper, for their inpatient operating costs. 42 U.S.C. § 1395ww(d).

22.    Under PPS, Medicare payments for hospital operating costs are no longer based on the costs they actually incur. Instead, they are based on predetermined, fixed, nationally applicable per case rates which vary by diagnosis related grouping ("DRG" rates). The DRG

4

rates are, in turn, subject to certain adjustments, including percentage enhancements for DSH providers. 42 U.S.C. § 1395ww(d)(1) – (5); 42 C.F.R. Part 412.

23.    The Secretary has delegated much of the responsibility for administering the Medicare Program to the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration (herein collectively referred to as "CMS"). The Secretary, through CMS, has contracted many of his audit and payment functions under Medicare to organizations known as "fiscal intermediaries."

24.    An intermediary is assigned to each hospital that participates in Medicare. Intermediaries make periodic payments to providers, which are subject to subsequent adjustments for overpayments or underpayments. 42 U.S.C. § 1395h.

25.    At the close of each fiscal year, a hospital must submit to its intermediary a "cost report" showing both the costs incurred by it during the fiscal year and the appropriate share of those costs to be apportioned to Medicare. 42 C.F.R. §§ 413.24 and 413.50. The hospital's intermediary is required to analyze and audit the cost report and issue a Notice of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its total Medicare reimbursement for the cost reporting period. 42 C.F.R. § 405.1803.

26.    If a hospital is dissatisfied with its intermediary's final determination of total Medicare program reimbursement for a cost reporting period, the hospital has a right to obtain a hearing before the Board by filing an appeal with the Board within 180 days of receiving its NPR. 42 U.S.C. § 1395oo.

27.    The decision of the Board constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within sixty (60) days of the hospital's notification of the Board's decision. 42 U.S.C. § 1395oo(f)(1); 42 CFR §§ 405.1875 and

405.1877. The Secretary has delegated his authority under the statute to review Board decision to the CMS Administrator.

28.     A hospital may obtain judicial review of a final administrative decision by filing suit within sixty (60) days of receipt of the decision in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia.  42 U.S.C. § 1395oo(f).

B.     The Medicare DSH Adjustment

29.     When Congress enacted Medicare PPS, it authorized the Secretary to provide an adjustment to PPS payments for hospitals that served a disproportionate share of low-income patients (i.e., the "disproportionate share hospital" or "DSH" payment).  Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, § 9105 (1986); 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

30.     The DSH payment provides supplemental Medicare reimbursement to hospitals for the increased cost of providing services to a disproportionate share of low-income Medicare beneficiaries.

31.     As the Ninth Circuit observed in Portland Adventist Medical Ctr. v. Thompson, 399 F.3d 1091, 1095 (quoting Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261, 1265 (9th Cir. 1996)):

> Congress "overarching intent" in passing the disproportionate
> share provision was to supplement the prospective payment system
> payments of hospitals serving "low income" persons.  The DSH
> provision directs the Secretary to provide an additional payment to
> hospitals serving a disproportionate number of low-income
> patients . . . . Congress intended the Medicare and Medicaid
> fractions to serve as a proxy for all low-income patients.

32.    The Secretary delegated to CMS the authority to administer DSH adjustments as part of the PPS reimbursement system. CMS, in turn, delegates the responsibility to the fiscal intermediaries who notify hospitals of their DSH adjustments in their NPRs.

33.    Both the qualification for a Medicare DSH payment, and the amount of the DSH payment, depends on a hospital's "disproportionate patient percentage."    42 U.S.C. § 1395ww(d)(5)(F)(v).

34.    The "disproportionate patient percentage" is the sum of two fractions (expressed as a percentage) -- the "Medicare fraction," and "Medicaid fraction" for a hospital's cost reporting period. 42 U.S.C. § 1395ww(d)(5)(F)(vi). These fractions are used by Congress as "proxies" for quantifying a hospital's services to indigent patients.

35.    The Medicare fraction is based on the number of low-income Medicare patients served by the hospital – that is, the number of days attributable to patients eligible for both Medicare Part A and supplemental security income ("SSI") benefits, divided by the total number of days attributable to all patients entitled to benefits under Medicare Part A.  42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  Only the Medicaid fraction is at issue in this case.

36.    The Medicaid fraction is based on the number of non-Medicare low-income patients served by the hospital.  Under 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), the Medicaid fraction is calculated as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of <u>patients who (for such days) were eligible for medical assistance under a State plan approved under Title XIX of this chapter</u>, but who were <u>not entitled to benefits under part A</u> of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.  (emphasis added.)

37.    The proper calculation of the numerator in the Medicaid fraction (the "Numerator") used to determine Cooper's FY 2000 DSH payment is the dispute in this case.  In

7

general, a larger number of patient days in the numerator of the Medicaid fraction means a larger

Medicare DSH payment.

38.    The implementing regulation of the Medicare DSH Statute, 42 C.F.R. §

412.106(b)(4), also prescribes how the Medicaid fraction is to be determined:

> The fiscal intermediary determines, for the same cost reporting
> period used for the first computation, the number of the hospital's
> patient days of service for which patients were <u>eligible for
> Medicaid</u> but not entitled to Medicare Part A, and divides that
> number by the total number of patient days in the same period.
> (emphasis added.)

39.    HHS' published Medicare regulations at 42 C.F.R. § 412.106(b)(4)(i) provide that

a patient is deemed eligible for Medicaid "if the patient is <u>eligible for inpatient hospital services

under an approved State Medicaid plan</u>."  (emphasis added.)

C.    The Medicaid Program

40.    Congress separately enacted Title XIX of the Social Security Act, which is

entitled "Grants to States for Medical Assistance Programs" (the "Medical Assistance Act"), in

1965.

41.    Title XIX, which is commonly referred to as "Medicaid," authorizes the use of

federal funds to help states offset the cost of providing medical assistance to eligible low-income

individuals. *See* 42 U.S.C. § 1396 *et seq.*

42.    To receive these funds, a state must develop a "state plan" that has been approved

by the Secretary.  42 U.S.C. §§ 1396a; 1396d(a).

43.    CMS regulations define a State Plan as "a comprehensive written statement

submitted by the [state Medicaid] agency describing the nature and scope of its Medicaid

program." 42 C.F.R. § 430.10.  Medicaid is defined by the Secretary in regulations

implementing Title XIX as "medical assistance provided under a state plan approved under title

XIX of the [Social Security] Act." 42 C.F.R. § 400.200.

8

44.     In New Jersey, the Department of Human Services, Division of Medical Assistance and Health Services administers the New Jersey Title XIX program in accordance with the CMS-approved New Jersey Medical Assistance State Plan.

45.     Federal law requires that each State Plan provide Medical Assistance coverage for certain statutorily-enumerated services to individuals who are both low-income and either aged, blind, disabled, pregnant or members of families with dependent children.  42 U.S.C. § 1396a(a)(10)(A)(i).

46.     Beyond this category of mandatory coverage, states have latitude to decide which individuals will be eligible for Medical Assistance and what services will be covered.  42 U.S.C. § 1396a(a)(10)(A)(ii).  A state is generally allowed to provide optional Medical Assistance to certain "categorically needy" individuals who are ineligible for mandatory benefits, and to certain "medically needy" individuals who would be eligible for mandatory benefits except that their income and resource levels are slightly above the maximum allowable limits for mandatory benefits.  42 U.S.C. § 1396a(a)(10)(A)(ii).

47.     The Medical Assistance Act also requires states to make additional Title XIX Medical Assistance payments to hospitals that serve a disproportionate number of low-income patients ("Medicaid DSH payment").  42 U.S.C. § 1396r-4.  In doing so, states must submit to the Secretary a state plan that includes:

> a description of the methodology used by the State to identify and make payments to disproportionate share hospitals, including children's hospitals, on the basis of the proportion of low-income and Medicaid patients (including such patients who receive benefits through a managed care entity) served by such hospitals. 42 U.S.C. § 1396r-4(a)(2)(D).

48.     The Medicaid DSH payment is different from, and in addition to, the Medicare DSH payment.

49.    Under the Medical Assistance Act, DSH adjustments also are determined based on a statutory proxy and are mandated for hospitals that treat a disproportionate number of indigent patients which expressly include both "Medicaid" patients and other "low income patients" (including charity care patients) on whose account no payment is made under a state plan. 42 U.S.C. § 1396r-(4)(b)(2) and (3). A separate provision mandates minimum DSH adjustment levels for hospitals that so qualify, and specifies that such enhancements to the base payment rates are in relation to the levels of care provided to both Medicaid and other low income patients. 42 U.S.C. § 1396r-4(c).

50.    Under the Medical Assistance Act, NJCCP patients are counted for purposes of determining a hospital's eligibility for Medicaid DSH and for purposes of quantifying a qualifying hospital's Medicaid DSH payment. 42 U.S.C. § 1396r-4.

51.    Only expenditures made under approved state plans are eligible for matching federal payments. 42 U.S.C. § 1396d(a)-(b).

52.    Payments made to the States by the federal government are based on a specified percentage of the amounts expended by the State as medical assistance under the state plan (the "Federal Matching Assistance Percentage" or "FMAP") and are commonly referred to as "Federal Financial Participation" or "FFP". 42 U.S.C. § 1396d(b).

53.    The FMAP varies by State based on the State's per capita incomes: the lower the average per capita income, the higher the match. 42 C.F.R. § 433.10(b).

54.    Section 1101(a)(8)(B) of the Social Security Act requires the Secretary to recalculate the percentages each year and publish them in the *Federal Register* between October 1 and November 3.

55.    During the fiscal year 2000, the Federal Medical Assistance Percentage for the State of New Jersey was fifty percent (50%).

56.    A state plan approved by CMS is eligible to receive FFP based on its FMAP for the Medicaid DSH payments it makes to hospitals, like Cooper, that qualify for such payments.

D.    The New Jersey Charity Care Program

57.    Qualifying New Jersey hospitals, including Cooper, are paid under the approved Medicaid state plan for services rendered to NJCCP patients in the form of Medicaid DSH payments.

58.    The Medicaid DSH program in New Jersey is set forth at §4.19A (pages I-256 through I-300) of the New Jersey State Plan and includes a detailed description of the NJCCP.

59.    The NJCCP is part of the New Jersey State Plan, which was approved by CMS under Title XIX on June 6, 2001, and made effective retroactive to January 1, 1998 by TN 98-07. [New Jersey State Plan at I-262].

60.    The NJCCP compensates hospitals that serve a disproportionately high number of low-income patients under the Medicaid DSH statute.

61.    The New Jersey State Plan sets forth the methodology by which NJCCP payments to New Jersey hospitals are determined. [New Jersey State Plan at I-262].

62.    Payments come from the Health Care Subsidy Fund established under the State Plan. [New Jersey State Plan at I-262].

63.    The Health Care Subsidy Fund, and the payments to hospitals made from it, are funded under the approved state plan as part of and through the Medicaid DSH program. [New Jersey State Plan at I-261, I-262, I-262.1].

64.    These Medicaid DSH payments are based on specific DSH payments made to Cooper on account of specific patients (i.e., for patients enrolled in the NJCCP). Claims relating to services provided to NJCCP patients are submitted monthly and are reviewed by the State's Fiscal Agent, Unysis.  NJAC § 10:52-12.2.

11

65.     Unysis, in turn, gives Cooper a monthly statement or Remittance Advice of NJCCP that have been accepted, which are "priced" using New Jersey Medicaid rates.  NJAC §§ 10:52-12.2; 10:52-12.3.

66.     NJCCP payment is based on the actual amount of documented charity care that it provides to particular individuals who qualify for NJCCP, and is calculated from the NJCCP claims submitted by the hospital to Unysis.  NJSA § 26:2h-18.59E.  However, hospitals like Cooper actually receive less than the actual documented charity care amount due to State budgetary constraints.  NJSA §§ 26:2H-18.59i(a); 26:2H-1859i(b)(3); 26:2H-18:59i(b)(4), (c).

67.     NJCCP day claims are subject to audit on behalf of the State and the inpatient days in question in this action all were audited and found by Unysis to be incurred on account of persons who satisfied the NJCCP indigency criteria.  NJAC § 10:52-12.1; 10:52-12.2.

68.     The DSH payment for NJCCP services typically is effected through a final settlement made one to two years after the end of the fiscal year in which the services were provided.

69.     New Jersey hospitals are prohibited from denying any admission or appropriate service to a patient based on that patient's ability to pay or source of payment.  NJSA § 26:2H-18.51; NJSA § 26:2H-18.64.

70.     When a self-pay patient presents at the hospital for the first time and it is unlikely that the patient will be able to pay for hospital care, Cooper makes an initial determination of eligibility for any medical assistance programs available, which includes NJCCP as well as Medicaid.  NJAC §§ 10:52-11, 12, 13.

71.     The NJCCP provides medical assistance to low-income New Jersey residents otherwise ineligible for "traditional" Medicaid coverage (that is benefits for "categorically needy" and "medically needy" persons).

12

72.    Once a patient is approved for NJCCP, Cooper presents the patient with a NJCCP enrollment card.

73.    The approved NJCCP card then gets audited by the State of New Jersey to ensure the services are rendered to particular, qualified individuals.

74.    Patients who qualify for NJCCP either receive hospital services without charge or pay a reduced amount based on a sliding scale depending on income level.

75.    If a patient's income is less than or equal to 200 percent of HHS poverty income guidelines, then the patient has no out-of-pocket obligations. NJAC § 10:52-11.14.

76.    Patients with incomes that are greater than 200 percent of HHS poverty income guidelines have some cost-sharing responsibility. NJAC §§ 10:52-11, 12, 13.

77.    Cooper rarely receives any payments from NJAC patients who do have some cost-sharing responsibility. Instead, Cooper typically writes off that patient responsibility as bad debt because most of the NJCCP patients whom Cooper treats have incomes which are less than or equal to 200 percent of HHS poverty income guidelines.

78.    The amount Cooper is paid under the state plan for NJCCP patients is less than the amount Cooper is paid on account of "traditional" Medicaid patients. This discounted fee only enhances Cooper's financial burden in providing care to these low-income patients, in comparison with those patients who qualify for traditional Medicaid coverage.

79.    From the perspective of Cooper, the NJCCP is in many respects indistinguishable from the operation of the mandatory and optional Medical Assistance coverage available under Title XIX. For example, when it is unlikely that a patient will be able to pay for hospital care, each New Jersey hospital is required to make "an initial determination of eligibility for any medical assistance programs available. NJAC § 10:52-11.5. The hospital shall refer the applicant to the appropriate medical assistance program," which includes the NJCCP. N.J.A.C.

13

Admin. Code § 10:52-11.59(d). Therefore, patients who are eligible for any type of Medical

Assistance in New Jersey, including the NJCCP, go through the same screening process at New

Jersey hospitals.

E.    Procedural History

80.    On October 13, 2003, Cooper filed a timely appeal of the Intermediary's failure to

include Charity Care Days in its calculation of Cooper's FY 2000 DSH payment with the

Provider Reimbursement Review Board ("Board") pursuant to 42 U.S.C. § 1395oo .

81.    A hearing was held on September 18, 2007 before the Board.

82.    In a decision dated March 28, 2008, the Board reversed the Intermediary's DSH

payment calculation and disallowance of the NJCCP patient days, holding that the

"Intermediary's adjustments improperly excluded New Jersey Charity Care program patient days

from the Provider's Medicare DSH calculation." Cooper University Hopsital v. Blue Cross Blue

Sheild Assoc., PRRB Dec. No 2008-D22 (Mar. 28, 2008), at 8.

83.    Among other things, the Board concluded, consistent with a host of earlier Board

decisions, that NJCCP patient days were indeed funded pursuant to an approved medical

assistance plan, and that the denial and disallowance were contrary to the plain language and

purpose of the Medicare DSH statute.   Id. at 8.

84.    The CMS Administrator on April 16, 2008 issued a notice advising that he would

be reviewing the Board's decision upon the request of CMS' Center for Medicare Management.

85.    The CMS Administrator reversed the Board's decision finding that "the days

involved in this case are related to individuals that are not eligible for 'medical assistance' as that

term is used under Title XIX and, thus, are not properly included" in the Medicare DSH

calculation.  CMS Admin. Dec. at 12.  That decision was apparently signed by the CMS

Administrator on May 23, 2008, but mailed to Cooper's counsel on May 29, 2008. It was received by Cooper's counsel on June 2, 2008.

86.     Under 42 U.S.C. § 1395oo, the decision of the Administrator is deemed to be the final determination in the case on behalf of the Secretary.

### COUNT I
### SECRETARY'S ACTION IS CONTRARY TO THE MEDICARE STATUTE

87.     Cooper hereby incorporates by reference paragraphs 1 through 86 above as though set forth herein.

88.     The Secretary's action is subject to judicial review pursuant to the applicable provisions of the APA. Under the APA, the reviewing court shall set aside agency action if, *inter alia*, it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

89.     The Medicare DSH Statute expressly requires the Secretary to include in Cooper's FY 2000 DSH payment all inpatient days attributable to patients eligible for medical assistance under a State Plan approved under Title XIX. This formulation is used as part of a proxy for identifying services to indigent patients and to ensure supplemental reimbursements to hospitals that provide care to a disproportionate volume of "low income patients." See 42 U.S.C. § 1396a(a)(13)(A)(iv).

90.     The NJCCP is an integral part of the New Jersey State Plan that was approved by the Secretary under Title XIX.

91.     The NJCCP compensates hospitals that serve a disproportionately high number of low-income patients through payments under the Medicaid DSH statute. The federal government, in turn, provides matching funds for NJCCP.

15

92.    CMS participates in the payment of NJCCP claims through Medicaid DSH payments, and thus treats NJCCP patients as persons who qualify for medical assistance under the approved New Jersey State Plan.

93.    The purpose of the DSH adjustment -- to compensate hospitals for the additional costs associated with treating low-income patients -- can only validly be accomplished if NJCCP days are included in the DSH calculation.

94.    The Secretary's decision that all inpatient days relating to NJCCP should be excluded from the calculation of Cooper's FY 2000 DSH payment is inconsistent with the plain meaning and clear purpose of the Medicare DSH statute.

95.    The Secretary's decision, therefore, violates the Medicare DSH statute and must be overturned.

## COUNT II
### SECRETARY'S INTERPRETATION OF REGULATION DOES NOT REASONABLY OR RATIONALLY INTERPRET THE MEDICARE STATUTE AND THEREFORE IS UNSUSTAINABLE UNDER THE ADMINISTRATIVE PROCEDURES ACT

96.    Cooper hereby incorporates by reference paragraphs 1 through 95 above as though set forth herein.

97.    The Secretary's decision must be set aside as arbitrary and capricious and otherwise contrary to law because it relies on an interpretation of a regulation, 42 C.F.R. § 412.106(b)(4), that is contrary to the language, legislative history, purpose and intent of Medicare DSH Statute, and is inconsistent with the Secretary's own regulations.

98.    The Medicare DSH Statute expressly requires the Secretary to include in Cooper's FY 2000 DSH payment all inpatient days attributable to patients eligible for medical assistance under a State Plan approved under Title XIX.

99.    The Secretary inappropriately applied  42 C.F.R. § 412.106(b)(4) to exclude from Cooper's FY 2000 DSH payment all inpatient days relating to NJCCP enrollees, even though the

16

NJCCP is part of the New Jersey Medical Assistance State Plan that was approved by the Secretary under Title XIX of the Social Security Act and even though the Secretary's own regulations define "Medicaid" coverage to include all services that are paid for under an approved state plan.

100.    This interpretation and application of the regulation contravenes the Medicare DSH Statute and is, therefore, invalid under the review standards of 5 U.S.C. § 706 and the Supreme Court's decision in Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984).

**WHEREFORE**, plaintiff, Cooper University Hospital, respectfully requests that this Court enter judgment in its favor as follows:

a.    An Order setting aside the Secretary's decision and finding that the Medicare Statute requires that days relating to patients eligible for NJCCP be included in the calculation of Cooper's FY 2000 DSH payment;

b.    An Order requiring the Secretary, on remand, to (a) reverse the intermediary's disallowance and recalculate Cooper's FY 2000 Medicare DSH payment after including all days relating to patients eligible for NJCCP, with interest calculated pursuant to 42 U.S.C. § 1395oo(f)(2), and (b) complete the recalculation and make the necessary payment to Cooper within 90 days of Cooper's submission of documentation as to the correct number of NJCCP patient days to be included for purposes of calculating its FY 2000 Medicare DSH payment;

c.    An Order pursuant to 28 U.S.C. § 2201 *et seq.*, and other pertinent authorities, declaring (a) invalid the Secretary's exclusion of all days relating to NJCCP patients from Cooper's FY 2000 DSH payment, and (b) that the authorities relied on in the Secretary's decision do not preclude the relief sought by Cooper in this action;

17

d.      Legal fees and costs of suit incurred by Cooper; and

e.      Such other relief as this Court may deem appropriate.

Respectfully submitted:

COZEN O'CONNOR

BY: _____

THOMAS McKAY, III, ESQUIRE
MARK H. GALLANT, ESQUIRE
KIMBERLY BANE HYNES, ESQUIRE
457 Haddonfield Road, Suite 300
P.O. Box 5459
Cherry Hill, New Jersey  08002-2220
(856) 910-5000
ATTORNEYS FOR PLAINTIFF
COOPER UNIVERSITY HOSPITAL

Dated:   July 28, 2008

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of July, 2008, she caused

true and correct copies of the Plaintiff Cooper University Hospital's Complaint, to be

served by certified mail, return receipt requested, on:

> Michael O. Leavitt
> Secretary of Health and Human Services
> General Counsel
> Department of Health and Human Services
> 200 Independence Avenue, S.W.
> Washington, D.C. 20201

Kimberly Bane Hynes, Esquire