IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

COOPER UNIVERSITY HOSPITAL,          :          HON. JEROME B. SIMANDLE

            Plaintiff,          :          Civil No. 08-3781 (JBS/JS)

    v.          :

                                  :          **OPINION**

KATHLEEN SEBELIUS, Secretary,  :
Department of Health and Human :
Services          :

            Defendant.          :

APPEARANCES:

Thomas McKay, III, Esq.
Mark H. Gallant, Esq., Pro Hac Vice
COZEN & O'CONNOR P.C.
Liberty View Building
457 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002
    Counsel for Plaintiff

Ralph J. Marra, Jr.
Acting United States Attorney
    By:  Elizabeth Ann Pascal
        Assistant U.S. Attorney
401 Market Street
Fourth Floor
P.O. Box 2098
Camden, NJ 08101
      -and-
David Hoskins
U.S. Department of Health and Human Services
Office of the General Counsel
200 Independence Ave. S.W.
Washington, D.C. 20201
    Counsel for Defendant

**SIMANDLE,** District Judge:

This matter is presented to the Court on Plaintiff Cooper University Hospital's request for judicial review of the decision of the Administrator of the Centers for Medicare and Medicaid Services ("CMS")[1] of the Department of Health and Human Services, that indirectly limits the amount of additional Medicare funding Plaintiff may receive as a hospital serving a significantly disproportionate number of low-income patients.  The sole issue for the Court is whether Plaintiff may include the number of "patient days" it serves under the New Jersey Charity Care Program ("NJCCP") when calculating its Medicare disproportionate share hospital ("DSH") adjustment.  Both parties seek summary judgment on this question [Docket Items 15 and 17].  For the reasons set forth below, the Court will grant summary judgment in favor of Defendant Kathleen Sebelius,[2] Secretary of the Department of Health and Human Services ("the Secretary") and deny Plaintiff's motion for summary judgment, because the CMS interpretation of the Medicare DSH provision excluding NJCCP patients is a permissible construction of an ambiguous statute.

---

[1] CMS was formerly known as the Health Care Financing Administration ("HCFA").  42 C.F.R. § 400.200.

[2] When this appeal was brought Michael O. Leavitt was Secretary, but he has since been replaced by Ms. Sebelius.  The Court will therefore order the Clerk of Court to change the name on the docket, pursuant to Rule 25(d), Fed. R. Civ. P.

I.    **BACKGROUND**

   A.  **Medicare and the Medicare Disproportionate Share
       Hospital Scheme**

   Medicare is a federal program enacted as Title XVIII of the
Social Security Act to cover the health care costs of the elderly
and disabled.  42 U.S.C. §§ 1395-1395ii.  Included as Part A of
the Medicare program are hospital insurance benefits.  Id. §§
1395c-1395i-5.  Since 1983, hospitals generally receive Medicare
payments for their operating costs through the Prospective
Payment System.  Id. § 1395ww(d).  Under this system, hospital
costs are measured based on a "'predetermined amount that an
efficiently run hospital should incur for inpatient services',"
rather than the actual cost of those services.  42 U.S.C. §
1395ww(d)(1)-(4); Portland Adventist Med. Ctr. v. Thompson, 399
F.3d 1091, 1093 (9th Cir. 2005) (quoting Legacy Emanuel Hosp. &
Health Ctr. v. Shalala, 97 F.3d 1261, 1262 (9th Cir. 1996)).
These payments are reconciled after the end of the fiscal year
based on a cost report the hospital submits to its Medicare
fiscal intermediary (an insurance carrier).  42 C.F.R. §§
405.1803, 413.20, 413.24, 413.50.

   In 1985, Congress, having found that it costs hospitals more
to treat low-income patients, provided for an adjustment for
hospitals serving a disproportionately large low-income
population -- called a disproportionate share hospital ("DSH").
42 U.S.C. § 1395ww(d)(5)(F)(i)(I); Adena Reg'l Med. Ctr. v.

3

Leavitt, 527 F.3d 176, 177-78 (D.C. Cir. 2008) (hereinafter,
"Adena II"); Portland Adventist, 399 F.3d at 1093-94.  Whether a
hospital qualifies as a DSH, and what amount of adjustment that
DSH hospital is entitled to, is determined by calculating the
hospital's Medicare "disproportionate patient percentage."  42
U.S.C. §§ 1395ww(d)(5)(F)(v).  That percentage is calculated
based on the sum of two fractions -- the "Medicare fraction" and
the "Medicaid fraction" -- for each cost reporting period.  Id. §
1395ww(d)(5)(F)(vi).  Together, the Medicare and the Medicaid
fractions act as a proxy for the number of low-income patients
served by the hospital.  Adena II, 399 F.3d at 1095.  The second
fraction -- the "Medicaid fraction" -- is the fraction at issue
in this case.  It reads in most relevant part (with the most
significant language underlined for easy reference):

> [T]he fraction (expressed as a percentage), the
> numerator of which is the number of the hospital's
> patient days for such period which consist of
> patients who (for such days) were eligible for
> medical assistance under a State plan approved
> under subchapter XIX of this chapter, but who were
> not entitled to benefits under part A of this
> subchapter, and the denominator of which is the
> total number of the hospital's patient days for
> such period.

Id. § 1395ww(d)(5)(F)(vi)(II).  The governing regulations state:

> (4) Second computation.  The fiscal intermediary
> determines, for the same cost reporting period used
> for the first computation, the number of the
> hospital's patient days of service for which
> patients were eligible for Medicaid but not
> entitled to Medicare Part A, and divides that
> number by the total number of patient days in the

same period. For purposes of this second computation, the following requirements apply:

(i) For purposes of this computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.

42 C.F.R. § 412.106(b)(4).

## B. Medicaid and Medicaid Disproportionate Share Hospital Scheme

Though not at the center of the present action, the Medicaid statutory scheme plays a significant role in interpreting the Medicare DSH statute presented to the Court. Title XIX of the Social Security Act governs the Medical Assistance or "Medicaid" program, 42 U.S.C. §§ 1396 - 1396w-2, which "is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services." Atkins v. Rivera, 477 U.S. 154, 156 (1986). For those states that elect to participate in the program, the federal government will share the costs of health care for those eligible low-income persons. Id. New Jersey payments made under its approved State plan are subject to 50 percent federal matching payments. Administrative Record ("AR")[3] 85, 619-20.

In order to participate, a state must create a "State plan"

---

[3] The Court has reviewed the 1163-page Administrative Record filed by the Secretary, herein referenced as "AR."

5

consistent with the Medicaid statutory requirements laid out in 42 U.S.C. §§ 1396a(1) to (65). CMS regulations define the "State plan" as "a comprehensive written statement submitted by the [state Medicaid] agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of title XIX." 42 C.F.R. § 430.10. Though states have some flexibility in shaping their plan, eligible beneficiaries are limited to certain groups of "categorically needy" persons, 42 U.S.C. § 1396a(a)(10)(A)(i) & (ii), and "medically needy" persons, Id. § 1396a(a)(10)(C), § 1396d(a)(i)-(xiii). As a consequence, "medical assistance" is defined in Title XIX as payment for certain designated services to either "categorically needy" or "medically needy" persons that fall within thirteen broader categories. Id. § 1396d(a); see id. § 1396a(a)(10)(A)(i) & (ii), (C).

As with the Medicare statute, states participating in the Medicaid program must take "the situation of hospitals which serve a disproportionate number of low-income patients with special needs" into account in their calculation of rates of payment for hospital services. Id. § 1396a(a)(13)(A)(iv). A hospital is deemed a Medicaid DSH based either on its "medicaid inpatient utilization rate" or its "low-income utilization rate." Id. § 1396r-4(b)(1). Like the Medicare DSH "disproportionate

6

patient percentage," the Medicaid DSH "low-income utilization rate" is the sum of two fractions (expressed as a percentage):

> (A) the fraction (expressed as a percentage)--
>
> (i) the numerator of which is the sum (for a period) of (I) the total revenues paid the hospital for patient services under a State plan under this subchapter (regardless of whether the services were furnished on a fee-for-service basis or through a managed care entity) and (II) the amount of the cash subsidies for patient services received directly from State and local governments, and
>
> (ii) the denominator of which is the total amount of revenues of the hospital for patient services (including the amount of such cash subsidies) in the period; and
>
> (B) a fraction (expressed as a percentage)--
>
> (i) the numerator of which is the total amount of the hospital's charges for inpatient hospital services which are attributable to charity care in a period, less the portion of any cash subsidies described in clause (i)(II) of subparagraph (A) in the period reasonably attributable to inpatient hospital services, and
>
> (ii) the denominator of which is the total amount of the hospital's charges for inpatient hospital services in the hospital in the period.
>
> The numerator under subparagraph (B)(i) shall not include contractual allowances and discounts (other than for indigent patients not eligible for medical assistance under a State plan approved under this subchapter).

Id. § 1396r-4(b)(3).  The Medicaid DSH "medicaid inpatient utilization rate," by contrast, is measured by a single fraction, with "the hospital's number of inpatient days attributable to patients who (for such days) were eligible for medical assistance

7

under a State plan approved under this subchapter" as the numerator and the total number of the hospital's inpatient days as the denominator.  Id. § 1396r-4(b)(2).

Under this framework, states have more flexibility to designate a Medicaid DSH and adjust payments than is true for designating a Medicare DSH. See id. § 1396r-4(b)(4)("The Secretary may not restrict a State's authority to designate hospitals as disproportionate share hospitals under this section.").  States may choose from three methods to determine the amount of adjustment, including one method based on "costs, volume, or proportion of services provided to patients eligible for medical assistance under a State plan approved under this subchapter or to low-income patients."  Id. § 1396r-4(c)(3).  In other words, Medicaid DSH reimbursements will generally be based upon a wider population of low-income patients than will the Medicare DSH reimbursement, which, at a gross level of analysis, makes sense because Medicaid is generally a low-income-based program while Medicare is based on age or disability and not necessarily income of the patients.

**C.   New Jersey Charity Care Program**

Cooper University Hospital seeks to count its New Jersey Charity Care Program patients in its Medicare DSH calculation. New Jersey hospitals are prohibited from refusing care on the basis of a patient's "ability to pay or source of payment."  N.J.

8

Stat. Ann. § 26:2H-18.64.  The New Jersey Charity Care Program
("NJCCP") is a state program that covers some or all of the costs
for uninsured hospital patients who are "ineligible for any
private or governmental sponsored coverage (such as Medicaid)."
NJ Hospital Care Payment Assistance Fact Sheet ("NJCCP Fact
Sheet"), AR 649; CMS Decision, AR 13-14; see N.J. Admin. Code §
10:52-11.5(c).  Hospitals are reimbursed for their NJCCP costs
through the Health Care Subsidy Fund, which itself receives
partial funding through Medicaid DSH payments.  N.J. Stat. Ann.
§§ 26:2H-18.58(a) -18.59(a); New Jersey State Plan Attachment
4.19A, AR 576, 578-80; NJCCP Fact Sheet, AR 649.

NJCCP patients are included in the calculation of Medicaid
DSH payments under New Jersey's State Medicaid plan, NJ State
Plan Attach 4.19A, AR 576, and charity care subsidy[4] payments are
described in the approved New Jersey State Medicaid Plan, id.
578-80.  NJCCP subsidy payments to hospitals are "based on actual
documented charity care."  Id. 578.  Payments by the New Jersey
Department of Human Services, Division of Medical Assistance and
Health Services ("DMAHS"), on account of NJCCP patients, are
subjected to audit on behalf of DMAHS, by its fiscal agent,

---

[4] New Jersey defines charity care subsidy as "the component
of the disproportionate share payment that is attributable to
care provided at a disproportionate share hospital to persons
unable to pay for that care."  N.J. Stat. Ann. § 26:2H-18.52.

Unisys.  Williams Testimony,[5] AR 76.  New Jersey law
characterizes these charity care payments as a "component" of the
"disproportionate share payments" paid by DMAHS to hospitals
identified by the State as "disproportionate share hospitals"
consistent with the Medicaid statute.  N.J. Stat. Ann. § 26:2H-
18.52.

Whether Cooper Hospital's NJCCP patients, who are counted
for the Medicaid DSH, are also to be counted for the federal
Medicare DSH payment to Cooper forms the central question in this
appeal.

### D.   Facts and Procedural History

Plaintiff is a 560-bed urban hospital located in Camden, New
Jersey, whose low-income patient population is among the largest
of the New Jersey hospitals.  Williams Testimony, AR 73.  Given
its significant low-income patient load, Plaintiff has routinely
qualified as a Medicare DSH, including for the fiscal year 2000.
Id.  For the fiscal years 1996 through 1999, Plaintiff had
included NJCCP days in the numerator of the "Medicaid fraction"
of its Medicare cost report DSH calculation, and those days were
accepted by Plaintiff's Medicare fiscal intermediary.  Id. 74-75,
85.

---

[5] Daniel Williams, Director of Reimbursement for Cooper
University Hospital, testified at a hearing before the Provider
Reimbursement Review Board and that testimony will be referred to
as "Williams Testimony" throughout this opinion.

In December 1999, CMS issued Program Memorandum ("PM") A-99-62, which specifically addressed the days that could be included in the Medicaid fraction of the Medicare DSH calculation.  PM A-99-62, AR 9.  CMS explained that "the focus [of the Medicaid fraction] is on the patient's eligibility for Medicaid benefits as determined by the State, not the hospital's eligibility for some form of Medicaid payment."  Id.  "Thus, for a day to be counted, the patient must be eligible on that day for medical assistance under the Federal-State cooperative program known as Medicaid (under an approved Title XIX State plan)."  Id.  In protest, Plaintiff claimed NJCCP days for the fiscal year 2000 in its Medicare DSH calculation.  Williams Testimony, AR 74. Applying PM-A-99-62, Plaintiff's fiscal intermediary removed 5,518 NJCCP patient days from the numerator of the Medicaid fraction, thereby reducing Plaintiff's Medicare reimbursement for the 2000 fiscal year by approximately $1.145 million.  Williams Testimony, AR 75; Pl. Exs. 1, 58, AR 184, 690.

Plaintiff subsequently filed a timely appeal to the Provider Reimbursement Review Board ("PRRB") pursuant to 42 U.S.C. § 1395oo(a).  In a unanimous opinion, the PRRB reversed the decision of the fiscal intermediary and ordered the reinstatement of the 5,518 charity care days in the Medicare DSH calculation. PRRB Decision, AR 29-37.  The PRRB found that NJCCP patients "qualify for medical assistance under a State plan approved under

Title XIX" within the plain meaning of Section
1395ww(d)(5)(F)(vi)(II).  Id. 35-36.

On May 23, 2008, the Administrator reversed the PRRB
decision and affirmed the decision of Plaintiff's fiscal
intermediary.  CMS Decision, AR 2-16.  The Administrator found
that NJCCP recipients were not eligible for "medical assistance"
under a State plan, adopting the definition of "medical
assistance" from the Medicaid statute, 42 U.S.C. § 1396d(a).  Id.
13.  The Administrator concluded that if a patient is not
eligible for Medicaid, then the patient is not "eligible for
medical assistance under a State plan under Title XIX."  Id. 12,
15.

On July 28, 2008, Plaintiff filed its Complaint with this
Court, seeking judicial review of the Administrator's decision
pursuant to 42 U.S.C. § 1395oo(f)(1).  On June 29, 2009, the
Court heard oral argument and reserved decision.  Post-argument
briefing was subsequently received and considered.

## II.  DISCUSSION

### A.  Standard of Review

Both parties having sought summary judgment, the Court must
determine whether the materials of record "show that there is no
genuine issue as to any material fact" such that either Plaintiff
or Defendant "is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(c).  When reviewing an agency's construction of a

12

statutory scheme it was entrusted to administer, the Court must first determine "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842 (1984).  If the plain meaning of the statute is clear "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43.  By contrast, if the statute is silent or ambiguous with respect to the issue presented, the Court moves to the second step of the analysis to determine whether the agency's construction of the statute is permissible.  Id. at 843.

"If [] the statutory provision is ambiguous, such ambiguity is viewed as an implicit congressional delegation of authority to an agency, allowing the agency to fill the gap with a reasonable regulation."  Swallows Holding, Ltd. v. C.I.R., 515 F.3d 162, 170 (3d Cir. 2008).  The Court must defer to the agency's construction so long as that interpretation is the product of notice-and-comment rulemaking or, as here, formal adjudication. Christensen v. Harris County, 529 U.S. 576, 586-87 (2000). "Where Congress expressly delegates to an agency the power to construe a statute, we review the agency's interpretation under the 'arbitrary and capricious' standard; where the delegation is implicit, the agency's interpretation must be 'reasonable.'" Torretti v. Main Line Hospitals, Inc., --- F.3d ----, 2009 WL 2767017, at *4 (3d Cir. Sept. 2, 2009).

13

**B.   <u>Chevron</u> Step One: Ambiguity of Statutory Text**

<u>Chevron</u> analysis in this case must begin with a
determination as to whether Congress has specifically and
unambiguously answered this question: May NJCCP days be included
in the Medicaid fraction of the Medicare DSH provision, where
NJCCP is indirectly funded through Medicaid DSH payments?  "The
inquiry into the ambiguity of a statutory provision must begin
with the text of the statute."  <u>Swallows Holding</u>, 515 F.3d at
170.  Contrary to the arguments of both parties, the Court finds
that the phrase in question -- "patients who . . . were eligible
for medical assistance under a State plan approved under
subchapter XIX [Medicaid statute] of this chapter" -- is
ambiguous, thereby triggering deference under <u>Chevron</u> step two.
In fact, the vehemence and cogency of both parties' positions
lends credence to the Court's view.  So does the disagreement
between the PRRB and the Administrator of CMS, the two expert
bodies to have looked at this issue here.

As both parties recognize, the above phrase is not defined
in Title XVIII, nor is the key term "medical assistance"
elucidated.  Whether NJCCP patients who are not eligible for
traditional Medicaid, but who receive care that is funded through
the Medicaid DSH, are "eligible for medical assistance under a
State plan" is not made plain when looking at the traditional
meaning of any portion of the above phrase.  Whether NJCCP

14

receive their medical assistance, as that term could be broadly used,[6] under a State plan that requires Medicaid DSH payments,[7] is not clear from the statute.  See Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary, 93 F.3d 103, 109 (3d Cir. 1996) (where term "all" not defined in provision and subject to more than one common usage in context, phrase is ambiguous).

This lack of clarity is not unique to the Medicare DSH provision.  The Supreme Court recognized long ago that "The Social Security Act is among the most intricate ever drafted by Congress."  Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981).  "Its Byzantine construction, as Judge Friendly has observed, makes the Act 'almost unintelligible to the uninitiated.'"  Id. (citations omitted).  Because the provision in question here is ambiguous, the Court must move to step two of the Chevron analysis.

---

[6] "Assistance" is defined generally as "the act or action of assisting; aid, help" or "the help supplied or given."  Webster's Third New International Dictionary 132 (Philip Babcock Gov 1993).  "Medical" is merely "of, or relating to, or concerned with physicians or with the practice of medicine often as distinguished from surgery" or "requiring or devoted to medical treatment."  Id. at 1402.

[7] Under 42 U.S.C. § 1396a(a)(13)(A)(iv), a Medicaid State plan must take into account "the situation of hospitals which serve a disproportionate number of low-income patients with special needs."

C.   **Chevron Step Two: Reasonableness of the Secretary's Interpretation**

As previously stated, this dispute turns on the meaning of the phrase "patients who . . . were eligible for medical assistance under a State plan approved under subchapter XIX [the Medicaid statute] of this chapter" included in the Medicaid fraction of the disproportionate patient percentage for Medicare DSH, 42 U.S.C. § 1395ww(d)(5)(vi)(II).[8]  The question becomes whether the Secretary's interpretation, through CMS, that the above phrase includes only patients who are eligible for traditional Medicaid is reasonable.  Plaintiff argues that this phrase is necessarily broad enough to encompass NJCCP patients who, though not eligible for Medicaid, receive funding (albeit, indirectly) through Medicaid DSH payments.  Defendant responds that the phrase expressly limits proxy patient days to those

---

[8] The entire relevant paragraph of the Medicare DSH statute reads:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(vi)(II).

16

patients eligible for Medicaid and does not include NJCCP
patients who are neither "eligible for medical assistance" under
the Medicaid statute, nor part of a State plan approved under the
Medicaid statute.  For the reasons discussed below, the Court
finds that the CMS view that NJCCP patients are excluded from the
Medicare DSH calculation is a permissible construction of the
statute and must be upheld, though the consequence is that
Plaintiff will receive millions less in federal aid under the
Medicare DSH funding scheme.

There is clear statutory support for the CMS determination
that NJCCP patients are not "eligible for medical assistance"
under a State plan within the meaning of Section
1395ww(d)(5)(vi)(II).  As discussed above, "medical assistance"
is not defined in Title XVIII of the Social Security Act, but
Title XIX of that Act (the subchapter expressly referenced in the
Medicaid proxy fraction) does define "medical assistance" as
payment for certain designated services to either "categorically
needy" or "medically needy" persons that fall within thirteen
broader categories.  42 U.S.C. § 1396d(a); see 42 U.S.C. §
1396a(a)(10)(A)(i) & (ii), (C); Adena II, 527 F.3d at 180 ("[T]he
federal Medicaid statute defines 'medical assistance' as 'payment
of part or all of the cost' of medical 'care and services' for a
defined set of individuals[.]").  Thus, patients "eligible for
medical assistance" under Section 1396d(a) must be eligible for

Medicaid.  NJCCP patients, by their very nature, are not eligible for "medical assistance," and consequently NJCCP does not provide "medical assistance" as defined in Title XIX.  NJCCP Fact Sheet, AR 649 ("[NJCCP patients are] ineligible for any private or governmental sponsored covered (such as Medicaid)"); CMS Decision, AR 13-14; see N.J. Admin. Code § 10:52-11.5(c).

That NJCCP does not provide "medical assistance" under Medicaid Section 1396d(a) is fatal to Plaintiff's claim, because CMS reasonably determined that the Medicaid proxy fraction at issue here incorporates the definition of "medical assistance" from the Medicaid statute.  Adena II, 527 F.3d at 179-80; see Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (holding that "cross-references" indicate two administrative programs within Social Security Act "operate together"); Sorenson v. Secretary of Treasury, 475 U.S. 851, 860 (1986) (observing that "the normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning") (internal citation omitted).  As the Court of Appeals for the District of Columbia recently held, Congress' cross-reference to the Medicaid statute in the Medicaid fraction of the Medicare DSH provision,[9] as well as the use of nearly identical language -- "patients eligible for medical assistance under a

---

[9] The Medicaid DSH provisions similarly cross-reference the Medicare DSH provisions.  42 U.S.C. §§ 1396r-4(c)(1) & (3).

18

State plan approved under this subchapter"[10] -- in the Medicaid

DSH provision designed for the same purpose (to adjust the rate

of payment to hospitals based on a proxy for low-income

patients), 42 U.S.C. § 1396r-4(c)(3)(B), suggest that Congress

intended "medical assistance" to have the same meaning in the

Medicare and Medicaid DSH provisions.  Adena II, 527 F.3d at 179-

80[11]; see Cabell Huntington Hosp., Inc. v. Shalala, 101 F.3d 984,

---

[10] The Medicaid DSH provision also includes the identical
phrase at issue here in calculating the "medicaid inpatient
utilization rate."  42 U.S.C. § 1396r-4(b)(2).

[11] Plaintiff argues that the Court should not be guided by
the D.C. Circuit's opinion in Adena II, which interpreted the
Medicaid fraction of the Medicare DSH provision and found that
Congress intended to incorporate the Section 1396d(a) definition
of "medical assistance."  Plaintiff suggests that the Adena II
opinion is fatally flawed, because the appeals court failed to
make reference to the recent Supreme Court opinion in
Environmental Defense v. Duke Energy Corp., 549 U.S. 561 (2007),
which, according to Plaintiff, repudiated the same-meaning
presumption relied on in Adena II.  As explained below, the Court
finds that Duke Energy did not eliminate the same-meaning
presumption and does prohibit the application of the presumption
in this context, so the appeals court's failure to reference it
in Adena II does not undermine that decision.
    Nor does the opinion in Adena II mark a dramatic split with
the Ninth Circuit in Portland Adventist, which held that
individuals who receive benefits through experimental projects
under 42 U.S.C. § 1315(a), Section 1115 of the Act (which allows
the Secretary "to waive compliance with the general federal
requirements for Medicaid state plans set out in § 1396a" so that
states may "adopt innovative programs" that meet the objectives
of Medicaid) must be included in the Medicaid fraction of the
Medicare DSH provision because they "receive medical assistance
'under a State plan.'"  Portland Adventist, 399 F.3d at 1093,
1096.  The purpose and focus of that decision was the Section
1115 waiver programs and whether these programs were "under a
State plan."  Id. at 1096.  While there is broad language
suggesting that Congress intended the Medicaid fraction "to serve
as a proxy for all low-income patients," the Ninth Circuit was

990 (4th Cir. 1996) ("Section 1396d defines 'medical assistance' to include twenty-five medical services.  If Congress had wanted 'medical assistance' to take on a completely different meaning in the context of this Medicaid proxy provision of the DSH calculation, Congress could easily have so indicated.")  The context of the two statutes thus justifies application of "[t]he normal rule of statutory construction" which presumes "'identical words used in different parts of the same act are intended to have the same meaning.'" Sorenson, 475 U.S. at 860 (quoting Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87 (1934)); see Stroop, 496 U.S. at 484 (cross-references between two parts of the Social Security Act illustrate Congress' intent that the programs work together and that a term used in both have the same meaning).[12]

Plaintiff does not dispute that incorporation of the Medicaid definition of "medical assistance" into the Medicare DSH provisions precludes inclusion of NJCCP patient days in the

_____

not faced with a situation like the one here, and the one presented to the D.C. Circuit in Adena II, of patients who are served by a state charity care program not included as a Medicaid experimental project.  See Portland Adventist, 399 F.3d at 1095-97; see also Cookeville Reg'l Med. Ctr. v. Leavitt, No. 04-1053, 2006 WL 2787831, at *6 (D.D.C. 2006) (finding pre-2005 Medicare DSH included Section 1115 expansion populations in the Medicaid fraction).

[12] The mere fact that Section 1396d begins with the heading "for the purposes of this subchapter" does not prohibit the application of the subsequent definitions to other subchapters within the Act.

Medicaid fraction.  Instead, Plaintiff attacks the principles of
statutory interpretation used to come to this conclusion.[13]  This
argument does not convince the Court that Defendant's
construction of the statute is impermissible or that Plaintiff's
construction is required.

Plaintiff argues that the Supreme Court in <u>Environmental</u>
<u>Defense v. Duke Energy Corp.</u>, 549 U.S. 561 (2007), "repudiated"
the rule of construction that the same terms within the same act
are presumed to have the same meaning.  Plaintiff misreads <u>Duke</u>
<u>Energy</u>.  In <u>Duke Energy</u>, the Supreme Court rejected the lower
court's excessively "rigid" characterization of the same-meaning
presumption as "effectively irrebuttable," but did not reject the
presumption itself, which has long been recognized as a basic
cannon of construction.  549 U.S. at 574-76.  Rather, the Court
clarified that presumption is not an "iron rule" to be considered

---

[13] Plaintiff also suggests that the term "medical
assistance" is used with a broader meaning in 42 U.S.C. §
1396a(a), which sets forth in detail the many requirements for "A
State plan for medical assistance."  Though it is a true that a
State plan must take into account disproportionate share
hospitals, this section does not alter the definition of "medical
assistance" to include state charity care patients who may
receive indirect assistance through an increase in payment rates
to the hospitals that treat them.  Instead, Section 1396a(a)
lists the requirements for a State plan, but does not redefine
"medical assistance."
Similarly, Plaintiff's reliance on the phrase "Federal
medical assistance percentage" as proof that "medical assistance"
is used within the Medicaid statute to include Medicaid DSH rate
adjustments is misplaced, because "Federal medical assistance
percentage" is a separate term of art with its own definition,
Section 1396a(b).

without reference to the context of the statute and will "readily yield" if context reasonably suggests that the same word or phrase has two meanings.  Id. ("Although we presume that the same term has the same meaning when it occurs here and there in a single statute, the Court of Appeals mischaracterized that presumption as 'effectively irrebuttable.'")

Moreover, the holding in Duke Energy must also be looked at in context.  The Supreme Court concluded that the lower court, when it impermissibly applied an irrebuttable same-meaning presumption, effectively invalidated an Environmental Protection Agency ("EPA") regulation that interpreted the word "modification" differently when used in two separate statutory provisions.  Id. at 573.  To require an iron-clad presumption was contrary to the traditional deference given to the agency's interpretation of the statutory scheme it is entrusted to administer.  Id. at 575 ("[T]he cross-reference alone is certainly no unambiguous congressional code for eliminating the customary agency discretion to resolve questions about a statutory definition by looking to the surroundings of the defined term, where it occurs.").  By contrast, here CMS has employed its expertise and its discretion and determined that the Medicaid fraction of the Medicare DSH provision does incorporate the definition of "medical assistance" from the corresponding Medicaid statute, so application of the presumption in this

context does not undermine agency discretion.  CMS Decision, AR 13.

In the present case, this Court has heard the Supreme Court's command that "Context counts," id. at 576, and concludes that the context of the Medicare DSH provision and the Social Security Act as a whole support the agency's application of the Medicaid "medical assistance" definition.  By making eligibility for Medicaid the key factor in determining which patients are included in the Medicaid proxy, the agency's construction is consistent with Congress' use of the phrase "eligibility for medical assistance under a State plan" as long-hand for eligible for Medicaid.[14]  Congress rarely uses the phrase "eligible for Medicaid," but when it does, it is synonymous with eligibility of medical assistance under a State Medicaid plan.[15]  29 U.S.C. § 1169(b)[16]; 42 U.S.C. § 1395w-4(g)(3)[17].

---

[14] The Court rejects Plaintiff's contention that Congress would have used the phrase "Medicaid recipients" if it wanted to refer to persons eligible for Medicaid, in part because Congress uses the phrase "eligible for Medicaid" and "eligible for medical assistance under a State plan" as having the same meaning, and in part because Congress never uses the phrase "Medicaid recipients" (though it does occasionally refer to "recipients").

[15] The relevant regulations similarly refer to "eligible for medical assistance under a State plan approved under subchapter XIX" as "eligible for Medicaid."  42 C.F.R. § 412.106(b)(4).

[16] Section 1169(b) of the ERISA statute addresses the impact of an ERISA group health plan beneficiary's eligibility for Medicaid on that beneficiary's rights under the plan.  The subject line refers to beneficiaries who are "eligible for medicaid benefits," but the substance of the provision refers to

The language of the Medicare DSH provisions itself supports
the agency's construction.  Congress recently amended the
Medicare DSH provision, suggesting Congress' intent to narrowly
apply the Medicaid proxy fraction.  Deficit Reduction Act of
2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (2006)
(codified at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)).  With that
amendment, Congress clarified that when calculating patient days
in the Medicaid fraction, patients who are ineligible for
Medicaid but receive benefits under 42 U.S.C. § 1315(a) as
participants in an experimental or demonstration project may be
included, even though they are "not . . . eligible" for "medical
assistance under a State plan."[18]  Id.  Moreover, as Plaintiff
itself points out, the Medicare DSH provides for an alternative
route to DSH payments, called the "Pickle method," that is not
limited by the Medicare and Medicaid proxy calculation, but

a person who is "eligible for or is provided medical assistance
under a State plan for medical assistance approved under title
XIX of the Social Security Act."  29 U.S.C. § 1169(b)(2).

[17] Section 1395w-4(g)(3) of the Medicare statute addresses
what physicians can charge for services.  The subject line covers
"[l]imitation on charges for medicare beneficiaries eligible for
medicaid benefits," but the body of the provision refers to
individuals who are "eligible for any medical assistance . . .
with respect to such services under a State plan approved under
subchapter XIX of this chapter."  42 U.S.C. § 1395w-4(g)(3)(A).

[18] In so doing, Congress rejected the opinion of the Ninth
Circuit in Portland Adventist that demonstration project
beneficiaries were unambiguously "eligible for medical assistance
under a State plan" and could be included in the Medicaid proxy
fraction of the Medicare DSH provision.  399 F.3d at 1095-97.

instead is based on "indigent care from State and local government sources."  42 U.S.C. § 1395ww(d)(5)(F)(i)(II). Congress included the Pickle method "[b]ecause of concern that this proxy measure of low-income status might substantially understate the presence of low-income patients in some hospitals, most particularly public hospitals in states where the medicaid eligibility standards are stringent."  H.R. Rep. No. 99-241(I), at 18 (1985), as reprinted in 1986 U.S.C.C.A.N. 579, 596.  Only those eligible for Medicaid are "eligible for medical assistance under a State plan" approved under the Medicaid statute and thus only those patients eligible for Medicaid can be included in the Medicaid fraction proxy.[19]

    The agency's construction of the Medicaid proxy in the

_____

[19] An earlier form of the Medicare DSH provision, included in a July 1985 bill introduced in the House, defined "low income patient" as "a patient who was, or is determined to have been, entitled to medical assistance under title XIX." H.R. 3128, 99 Cong. (1985).  At oral argument Plaintiff argued that this language is narrower than the language ultimately made into law ("medical assistance under a State plan approved under Title XIX"), suggesting that those entitled to medical assistance under a State plan under the Medicaid Act is a broader population than those eligible for medical assistance under the Medicaid Act. The Court finds that any changes in drafting during the legislative process do not compel the conclusion demanded by Plaintiff -- namely, that Congress intended to cover a larger population in its Medicaid proxy calculation by adding the term "under a State plan." See First Merchants Acceptance Corp. v. J.C. Bradford & Co., 198 F.3d 394, 402 (3d Cir. 1999) ("[A]ttempting to divine legislative intent on the basis of 'Congress's unexplained modification of language in earlier drafts of legislation' can be problematic.") (quoting Appalachian Power Co. v. E.P.A., 135 F.3d 791, 810 (D.C. Cir. 1998)).

Medicare DSH fraction is further supported by the corresponding
Medicaid DSH provisions.  First, the Medicaid DSH provisions
provide for two means of designating a DSH hospital, either via a
"medicaid inpatient utilization rate" or a "low-income
utilization rate."  42 U.S.C. § 1396r-4(b)(1).  The low-income
utilization rate distinguishes between "revenues paid the
hospital for patient services under a State plan" and "the
hospital's charges for inpatient hospital services which are
attributable to charity care."[20]  Id. § 1396r-4(b)(3).  Second,
and perhaps more significantly, the "medicaid inpatient
utilization rate," which Plaintiff concedes refers to inpatients
eligible for "traditional" Medicaid benefits, is measured solely
by "inpatient days attributable to patients who (for such days)
were eligible for medical assistance under a State plan approved
under this subchapter" -- a verbatim repetition of the language
relevant here in the Medicaid proxy fraction of the Medicare DSH
provision.  Id. § 1396r-4(b)(2).  Finally, when calculating the
payment adjustment for a Medicaid DSH, one method a state may
choose distinguishes between "patients eligible for medical

---

[20] The Court rejects Plaintiff's argument that Medicaid DSH
payments based in part on the number of NJCCP patients a hospital
serves must lead NJCCP patients to be included within the former
"revenues," rather than the latter "charity care" fraction.  The
suggestion that Medicaid DSH payments would be included in
calculating Medicaid DSH payments unreasonably stretches the
plain language of the statute to force a different meaning for
"medical assistance under a State plan."

26

assistance under a State plan approved under this subchapter" and other "low-income patients." Id. § 1396r-4(c)(3)(B). The distinction between those patients eligible for Medicaid and other patients, including charity care patients, in the Medicaid DSH provision thus confirms the Secretary's interpretation of the Medicaid proxy at issue here. It further explains why Plaintiff may continue to include NJCCP patients when calculating Medicaid DSH rate adjustments, but those same patients cannot be included in the far narrower DSH provisions in the Medicare statute. Nor is this distinction irrational, for while Medicaid is an acutely income-dependent program concerned broadly with low-income patients, Medicare is focused specifically on the elderly and disabled and less tethered to income.

Plaintiff maintains that the agency's construction of the Medicaid proxy fraction is belied by the nature of the NJCCP program, which it argues is part of the approved State Medicaid plan and provides payments to specific charity care patients. In making this argument, Plaintiff relies heavily on the district court opinion in Adena Reg'l Med. Ctr. v. Leavitt, 524 F. Supp. 2d 1 (D.D.C. 2007) ("Adena I"), which was ultimately overturned by the circuit court in Adena II. The Court disagrees and concludes that the views of Plaintiff and the Adena I district court are not compelled by the statute. Under the Medicaid statute, states are required to "take into account . . . the

27

situation of hospitals which serve a disproportionate number of low-income patients with special needs" when determining the "rates of payment under the plan for hospital services."  42 U.S.C. § 1396a(a)(13)(A).  The NJCCP program is described in the New Jersey State plan because NJCCP patients are included when calculating the Medicaid DSH payment adjustment, where they are a proxy for low-income patients.  This does not make NJCCP patients the beneficiaries of the Medicaid program, any more than Medicaid patients are beneficiaries of the Medicare program simply because they were included in the Medicare DSH calculation.  An increase in Medicaid rates to hospitals is not medical assistance for NJCCP patients used as a proxy.

The District of Columbia Circuit in Adena II considered a similar program in Ohio's Hospital Care Assurance Program ("HCAP")[21] and came to the same conclusion.  HCAP, like NJCCP, required hospitals to provide medical services to indigent Ohioans who "'are not recipients of the medical assistance program,' i.e. the Ohio Medicaid plan" without cost.  Adena II, 527 F.3d at 177.  HCAP, like NJCCP, is included in the Medicaid plan in that the charity care program is used in calculating

---

[21] In a series of letters following oral argument, the parties debated about the nature of HCAP and its relationship to the Ohio Medicaid plan.  During this exchange, Defendant submitted a portion of Ohio's Medicaid plan, and Plaintiff moved to strike this document.  Because the Court has not relied on this exhibit, Plaintiff's motion to strike is moot.

Medicaid DSH payments (and, in fact, the Secretary approved modifications to HCAP regulations governing eligibility as an amendment to Ohio's Medicaid plan).  <u>Id.</u> at 178-79. Nevertheless, the appeals court observed:

> Hospitals in Ohio receive more DSH funds under the Medicaid plan the more HCAP patients they treat not because those patients receive care under the Medicaid plan, but because Ohio law treats such patients as a proxy for low-income patients, just as the Medicare provision treats Medicaid patients as a proxy for low-income patients.  Thus, the Ohio Medicaid plan provides a hospital more money for Medicaid patients the more HCAP patients it treats, just as the federal Medicare statute provides a hospital more money for Medicare patients the more Medicaid patients it treats, <u>Cabell Huntington Hosp., Inc.</u>, 101 F.3d at 985.

<u>Adena II</u>, 527 F.3d at 179 n.**.  It is undeniable that New Jersey has decided to direct the additional payments towards the Health Care Subsidy Fund, which in turn reimburses hospitals for their NJCCP patient services.  Nonetheless, money is a fungible commodity and New Jersey's characterization of the use of Medicaid DSH payment adjustments does not override the nature of those payments as described in the federal statute at issue here and interpreted by CMS.

### D.    Degree of Deference

Even if the agency's present interpretation of the Medicare DSH provision is reasonable, Plaintiff argues that it deserves no deference under <u>Chevron</u> because it is an informal interpretation that marks a break with past agency position.  The Court

disagrees with Plaintiff.  The agency interpretation presently
before the Court is the result of formal adjudication and
deserving of deference.  See, e.g., North Broward Hosp. Dist. v.
Shalala, 172 F.3d 90, 93-94 (D.C. Cir. 1999) (applying
Chevron deference to Secretary's interpretation of the Medicare
DSH provision announced in a decision in the administrative
review process available under 42 U.S.C. § 1395oo); Good
Samaritan Hosp. Reg'l Med. Ctr. v. Shalala, 85 F.3d 1057, 1061-62
(2d Cir. 1996) (Secretary's final administrative decision
entitled to Chevron deference).  The Court is not reviewing CMS's
December 1999 program memorandum, though PM-99-62 provoked this
litigation, but instead the CMS decision reversing the PRRB
through a lengthy administrative procedure that permits parties
to present evidence and argument.  The agency decision here is
sufficiently formal to warrant deference to the agency's
statutory interpretation under Chevron.

Nor does any evidence of inconsistent interpretations by CMS
free the Court from Chevron's deferential standard of review.
Plaintiff points to three instances in which, according to
Plaintiff, CMS interpreted the Medicare DSH provision to include
charity care patient days:  First, the period from 1996 through
1999 when Plaintiff's intermediary included NJCCP patient days in
the Medicaid fraction; second, the PRRB decision in Jersey Shore
Med. Ctr. v. BCBS Assoc. of New Jersey, HCFA Admin. Dec. (Jan. 4,

30

1999), AR 288-89; and third, a CMS memorandum dated August 16,
2002 regarding prison inmate care, available at
http://www.cms.hhs.gov/smdl/downloads/smd081602.pdf.  As an
initial matter, "An agency is free to change the meaning it
attaches to ambiguous statutory language, and the new
interpretation may still be accorded <u>Chevron</u> deference."
<u>Southern Utah Wilderness Alliance v. Dabney</u>, 222 F.3d 819, 828
(10th Cir. 2000) (citing <u>Chevron</u>, 467 U.S. at 863-64).  The Third
Circuit recently explained when reviewing a Federal
Communications Commission interpretation of the Communications
Act of 1934 and its decision to alter decades-old regulations:

> [T]o the extent that the FCC's current
> classification of wireline broadband Internet
> access service conflicts with past agency rulings,
> [<u>Nat'l Cable & Telecomms. Ass'n v. Brand X Internet</u>
> <u>Services</u>, 545 U.S. 967 (2005)] makes clear that an
> "[a]n initial agency interpretation is not
> instantly carved in stone.  On the contrary, the
> agency . . . must consider varying interpretations
> and the wisdom of its policy on a continuing
> basis."  <u>Id.</u> at 981 [] (internal quotation marks
> omitted). As the Supreme Court stated, "[t]hat is
> no doubt why in <u>Chevron</u> itself, this Court deferred
> to an agency interpretation that was a recent
> reversal of agency policy."  <u>Id.</u> at 981-82 [].
> Accordingly, we do not agree that past conflicting
> FCC rulings render its statutory classification in
> this order arbitrary and capricious.

<u>Time Warner Telecom, Inc. v. F.C.C.</u>, 507 F.3d 205, 219 (3d Cir.
2007).  Thus, in <u>Thomas Jefferson University v. Shalala</u>, 512 U.S.
504 (1994), the Supreme Court found that the Secretary's
statutory interpretation was still entitled to deference even

though a fiscal intermediary had taken actions contrary to the

Secretary's present interpretation:

> For even if petitioner could show that such
> [action] was approved by - or even brought to the
> attention of - the Secretary or her designate at
> the time, "[t]he Secretary is not estopped from
> changing a view she believes to have been grounded
> upon a mistaken legal interpretation." Good
> Samaritan Hospital v. Shalala, 508 U.S. 402, 417 []
> (1993).  And under the circumstances of this case,
> "where the agency's interpretation of [its
> regulation] is at least as plausible as competing
> ones, there is little, if any, reason not to defer
> to its construction." Id. at 417 [].

Id. at 515.

In the present case, none of Plaintiff's three listed

examples of contrary interpretation directly address the issue

presented here.  There is nothing to suggest that CMS formally

ratified or directed Plaintiff's fiscal intermediary's decision

to permit Plaintiff to include NJCCP days in the Medicare DSH

calculation.  The CMS decision in Jersey Shore reviewing a PRRB

opinion that permitted a hospital to include NJCCP patient days

in the Medicare DSH calculation, specifically declined to address

the question and remanded the issue to the PRRB to make a factual

distinction between Medicare DSH payments and charity care

payments.  AR 288-89.  The August 16th memorandum concerns

including prisoner medical care in the Medicaid DSH calculation.

Though each instance might be interpreted as undermining the

agency's present position, the Court declines to bind CMS to

Plaintiff's interpretation based on these actions that only

tangentially relate to the issue at hand.  Moreover, as previously discussed, to the extent they reflect a contrary interpretation, CMS was free to change its view so long as it adopts a permissible statutory construction.[22]  See Thomas Jefferson Univ., 512 U.S. at 515.

Finally, the Court is not unmindful of the potentially devastating impact of the loss of NJCCP patient days in Plaintiff's Medicare DSH funding on the hospital and the low-income patients it is required to serve.  Unfortunately, it is

---

[22] Plaintiff cites Paralyzed Veterans of America v. D.C. Arena, 117 F.3d 579 (D.C. Cir. 1997) for the proposition that CMS cannot change its position regarding Medicare DSH without formal notice and comment rulemaking.  The holding in Paralyzed Veterans is narrower than this and does not requiring rulemaking in this circumstance, even assuming that CMS has changed positions regarding the Medicare DSH provision.  In Paralyzed Veterans the appeals court considered, among other things, the level of deference due to a Department of Justice interpretation of its own regulations promulgated under the Americans with Disabilities Act ("ADA") to "flesh out" standards applicable to facilities covered by the ADA.  117 F.3d at 580-81.  The court distinguished between agency interpretation of a statute and agency interpretation of its own regulation, noting that Congress requires an agency to provide a notice and comment period before changing a regulation.  Id. at 586.  The court observed, "To allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment obviously would undermine those APA requirements."  Id.
By contrast, Plaintiff presently challenges CMS's interpretation of an ambiguous statute, falling perfectly into the Chevron scheme.  Though CMS has promulgated regulations that accompany the Medicare DSH provision, those regulations virtually mirror the language in the statute itself.  42 C.F.R. § 412.106(b)(4).  The interpretation at issue here, as presented in the final agency decision and as argued before this Court is the proper interpretation of the Social Security Act, not any implementing regulations.

not within this Court's power to reject the agency's reasonable construction of the statutory provision at issue.  Congress has created a provision that permits CMS to measure the number of low-income patients served by using only Medicaid and Medicare eligible patients as a proxy for the purpose of measuring Medicare DSH payments (in contrast to the more flexible Medicaid DSH provisions) and objections to this restrictive method should be brought to Congress.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes the Secretary's determination is reasonable that NJCCP patient days may not be included in calculating a hospital's Medicare DSH adjustment, for such patients are not eligible for medical assistance under a State Medicaid plan.  Consequently, the Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment.


**September 28, 2009**                    **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          United States District Judge